UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Crim. No. 6-29-B-W |
| | ) |
| BYRON POLK, | ) |
| | ) |
| Defendant | ) |

**RECOMMENDED DECISION**

Defendant Byron Polk has moved to suppress statements made to law enforcement officers (Docket No. 35) and a computer and other physical evidence seized from his residence (Docket No. 36). I held an evidentiary hearing on August 1, 2006. Based upon the evidence presented at that hearing[1] I now recommend the court adopt the following proposed findings of fact and deny both motions.

*Proposed Findings of Fact*

Scott Kelley is a Postal Inspector of the United States Postal Inspection Service whose assignments include the investigation of cases of alleged child pornography. On February 23, 2005, he traveled with Maine State Police Detective Brian Strout to Stacyville, Maine to visit Byron Polk at the Todd Hayes residence. Strout was involved in the investigation only because of the possibility of violations of state law and because he knew the area better than the postal inspector and had worked with postal authorities in the past on similar cases. Polk lived in a downstairs room of the Hayes house. Strout and Kelley were allowed entry into the house by the owner and waited on the landing between the upstairs and downstairs. Polk came up the stairs in response to a call from the homeowner. The officers, who both were wearing plainclothes,

---

[1] Postal Inspector Scott Kelley did not testify at the hearing and these proposed findings of fact (other than background information regarding his status and involvement in the investigation) do not rely upon his affidavit.

identified themselves and indicated to Polk that they would follow him downstairs to his room as they wanted to speak with him. Polk did not protest or otherwise indicate to the officers that they could not come downstairs. In fact, both he and Detective Strout testified that Polk was extremely cooperative.

All three men, the two officers and Polk, were seated in Polk's bedroom. The officers explained to Polk that they were there to ask him some questions about his use of the Internet. For approximately five to ten minutes the conversation was generic in nature and Kelley asked Polk some general questions about his use of the Internet. These questions included whether Polk chatted on-line, whether "kangaroo jack" was his screen name and other general questions about computer use. The officers spoke in conversational tones and the tenor of the exchange was "laid back." Polk told the officers that he suffered from a nervous condition.

Before beginning formal questioning at approximately 9:30 a.m., Agent Kelley read the <u>Miranda</u> warning to Polk and obtained Polk's voluntary waiver of those rights and agreement to speak with the officers. Polk, who acknowledged that he could read and write English, does not remember the <u>Miranda</u> form being presented to him. However, Strout was in the room when Kelley went over the form with Polk and heard him explain <u>Miranda</u> to Polk. Polk told the officers he understood his rights and wished to waive them. He signed the waiver. While Polk professes no memory of these events and believes that he was presented with the <u>Miranda</u> form much later in the conversation, I have no doubt that Kelley reviewed <u>Miranda</u> with Polk and obtained his waiver at approximately 9:30 a.m. Polk does not deny that he agreed to talk with the officers, but maintains that he did so because he believed that if he did not cooperate he would be arrested. The officers never threatened arrest and, in fact, Detective Strout told Polk he would not be arrested that day.

The officers then proceeded to interview Polk for approximately two hours. Polk remained seated on the couch in his room and Kelley and Strout were seated on other pieces of furniture or stood against the wall. The officers did not arrest Polk, place him in handcuffs or restrict his freedom of movement in any meaningful way. At one point Polk indicated he needed to take some medication and the officers asked him to tell them which medication he needed and then handed it to him, essentially preventing Polk from walking across the room to get his own medicine. Polk was not denied access to the required medication. At another point in the interview the telephone rang and it was Polk's girlfriend who wanted to talk to him. Detective Strout may have told Polk not to answer the phone, but when Polk said he had been expecting the call, he was allowed to answer the phone but told to keep the conversation brief.

During the entire two hour interview neither officer raised his voice nor behaved in a threatening manner. When Polk answered certain questions in a manner that Kelley believed to be untruthful, Kelley stated that he knew Polk's response was untruthful. Polk indicated he wanted to cooperate with the interview and he never attempted to end the interview or asked the officers to leave. Detective Strout described Polk's behavior as cooperative, but evasive. When confronted with certain inaccuracies in his testimony, Polk eventually admitted to certain incriminating conduct.

At approximately 11:30 a.m., toward the conclusion of the interview, Kelley told Polk he wanted to take his computer to search it for images of children being sexually exploited. He presented Polk with a Consent to Search form which Polk ultimately signed. Detective Strout received a call on his phone when Kelley was in the middle of explaining the form. Strout left the room for two to three minutes and did not hear exactly what was said as the consent to search form was completed, but Kelley never raised his voice nor did anything appear untoward when

Strout returned to the room. Upon his return or shortly thereafter, Strout observed Polk sign the form giving his consent to the search. Polk explains his conduct based upon his nervous condition and his concern that if he did not appear cooperative he would be arrested. However, Polk's own version of his interaction with Inspector Kelley while Strout was on the phone call does not suggest that Kelley threatened him with arrest or told him he had to consent to the search. Whatever concerns Polk had regarding his need to be cooperative, they all seemed to spring from his own mind and not from anything specific the officers said or did. Polk's only reservation concerned the fact that the computer was a rental. He ultimately signed the form. He clearly understood that the officer was asking for his permission to seize the computer and related articles and he gave that consent because he wanted to appear cooperative and helpful.

Two and one-half months later Strout returned to the Sherman area to visit Polk at his new residence as a follow-up to the state investigation. During that ten to fifteen minute interview conducted at a kitchen table Polk again appeared cooperative. At the conclusion of the discussion Polk told Strout that his attorney had told him not to speak with the detective, but in spite of the caution Polk wanted to speak with him anyway, evidencing his continuing desire to appear cooperative.

### *Discussion*

1.   **Miranda  & Voluntariness Issues**

Polk originally moved to suppress his statements on the ground that they were obtained in violation of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and Dickerson v. United States, 530 U.S. 428 (2000), in that they were the product of an unwarned, custodial interrogation and they were also involuntary under the totality of the circumstances. Although the Government spent a large portion of its responsive memorandum arguing that the

circumstances in this case were noncustodial and therefore Polk's Miranda rights were not implicated, see Illinois v. Perkins, 496 U.S. 292, 297 (1990); Rhode Island v. Innis, 446 U.S. 291, 299-301 (1980), I am satisfied Officer Kelley fully complied with Miranda and Polk voluntarily waived those rights.  Thus, even if the invocation of Miranda by Officer Kelley was entirely gratuitous, it did no harm in this instance.

     For purposes of the Fifth Amendment, "in custody" means that the defendant has been formally arrested or has had his freedom of movement restrained to the degree associated with a formal arrest.  United States v. Ventura, 85 F.3d 708, 710 (1st Cir. 1996).  Whether the restraint on movement is sufficient to rise to the level of an arrest depends on the objective circumstances and how they would be perceived by a reasonable person standing in the shoes of the suspect. Id. at 711.  "Relevant circumstances include whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation."  Id. (quotation marks and citation omitted).  Polk was not "in custody" when he made the statements to the officers and there is no basis under Miranda for suppressing these statements.   Magistrate Judge Cohen previously observed in a recommended decision that the test to be applied to a "knock and talk" situation is an objective one, *i.e.*, whether a reasonable person in Polk's position "would have felt free to decline the agents' requests or otherwise terminate the encounter."  United States v. Cannizzaro, Crim. No. 04-103-P-H, 2005 U.S. Dist. LEXIS 2976, *25, 2005 WL 757884, *8 (D. Me. Feb. 16, 2005) (aff'd Mar. 8, 2005).  I am satisfied that a reasonable person in Polk's position would have understood that he had the ability to terminate the encounter, especially since Polk had been fully informed of his Miranda rights. Polk's desire to be cooperative and his concern that he would be arrested if he did not cooperate

came from his own idiosyncratic view of his predicament and was not the product of the officer's conduct. Nothing the officers did converted this interview, even though it was lengthy, into a custodial situation. In fact, when the telephone call came, by Polk's own testimony he actually left the room with the phone in order to talk in private. The incident involving access to his medication, although emphasized by defense counsel, did not convert this encounter into a custodial setting, but even if it did, the officers had fully complied with Miranda by that point in time.

      The remaining question raised by the motion, of course, is whether or not the defendant's statements were voluntarily made. The burden is on the government to prove that the defendant's statements were voluntary by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 489 (1972). The government must show that, based on the totality of the circumstances, the investigating agents neither "broke" nor overbore the defendant's will, Chambers v. Florida, 309 U.S. 227, 240 (1940), and that his statements were "the product of a rational intellect and a free will," Blackburn v. Alabama, 361 U.S. 199, 208 (1960). See also Lynumn v. Illinois, 372 U.S. 528, 534 (1963). As this language suggests, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'." Colorado v. Connelly, 479 U.S. 157, 167 (1986). Coercive police activity may include either the creation of a susceptible psychological state in the person interrogated, Townsend v. Sain, 372 U.S. 293, 307-308 (1963) (concerning alleged administration of "truth serum" to quell heroin addict's withdrawal symptoms), or the exploitation of an existing psychological condition, Blackburn, 361 U.S. at 207-208 ("[A] most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane.")

The First Circuit has noted that because a suspect is in a weakened condition because of his heroin withdrawal symptoms, it does not necessarily follow that his post-arrest statements are involuntary.  United States v. Palmer, 203 F.3d 55, 61-62 (1st Cir. 2000) ("In the context of the voluntariness of a confession, a defendant's mental state by itself and apart from its relation to official coercion never disposes of the inquiry into constitutional voluntariness.").  In the context of the present case, the police conduct was exemplary in that they fully informed Polk of his Miranda rights and were polite and low key throughout the interview.  There is no evidence that their behavior was unduly coercive.  Polk was in full control of his faculties, albeit nervous about his situation.  Based upon the totality of the circumstances, I am satisfied that the statements made by Polk and his decision to cooperate with the authorities were voluntary acts under applicable federal precedent.

 **2.    The Consent to Search**

The Government seeks to justify the warrantless search of the computer as a search undertaken pursuant to Polk's consent.  Polk, on the other hand, argues that he merely acquiesced to the officer's show of authority and did not affirmatively consent to the initial search of his computer.  Under the test set forth in Schneckloth v. Bustamonte, 412 U.S. 218 (1973), consent is voluntary if the defendant's will was not overborne in the sense of suffering a "critically impaired . . . capacity for self-determination." Schneckloth, 412 U.S. at 225; United States v. Wilkinson, 926 F.2d 22, 25 (1st Cir. 1991) (overruled on other grounds as recognized by United States v. Manning, 79 F.3d 212, 216 (1st Cir. 1996)).  In this case it is undisputed that Polk responded in the affirmative when Kelley indicated he wanted to seize Polk's computer and search it for images of child pornography.  Polk's only expression of concern had to do with the fact that it wasn't really his computer, he had a rental agreement, and he was not sure whether the

7

company had a right to know about the seizure by the officers before they took the computer away.

The government is not required to show that the person knew of the right to refuse consent in order to establish that the consent was voluntary. United States v. Matlock, 415 U.S. 164, 166 n.2 (1974); see also United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993) ("Written consent is not essential to the establishment of a valid consensual search."). The government only bears the burden of proving the consent was voluntary. Florida v. Royer, 460 U.S. 491, 497 (1983).

In this case Polk voluntarily made statements to the officers and spoke with them for over two hours after being fully apprised of his Miranda rights. Almost two hours into the conversation he consented to the seizure and subsequent search of his computer for pornographic images. He was in no way compelled by the officers to sign the consent to search or the receipt for the property seized. In spite of Polk's current failure of memory on those issues, I am satisfied that he signed both documents voluntarily at the time. Polk's own testimony supports the conclusion that at the time of the interview in February 2005 Polk wanted very much to fully cooperate with the officers and was willing to consent to a search of the computer. I am satisfied there is no basis to suppress this evidence.

## Conclusion

Based upon the foregoing, I recommend that the court deny the motions to suppress. (Docket Nos. 35 & 36.)

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the

district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

August 2, 2006